<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WESLEY DEDRICK,<br><br>    Plaintiff,<br><br>    v.<br><br>VALUABLE TECHNOLOGIES, INC.,<br><br>    Defendant. | No. 22cv4341 (EP) (JBC)<br><br>**OPINION** |

**PADIN**, **District Judge.**

Pro se Plaintiff Wesley Dedrick, Defendant Valuable Technologies, Inc. ("VT")'s former Vice President of Sales, alleges securities fraud and a breach of contract stemming from a loan by Plaintiff to VT. D.E. 26 ("Amended Complaint" or "Am. Compl."). VT moves, pursuant to Rule 12(b)(6), to dismiss the Amended Complaint. D.E. 28 ("Mot."). For the reasons below, the Court will **GRANT** the motion and **DISMISS** the Amended Complaint, but permit Plaintiff an opportunity to amend.[1]

I.  **BACKGROUND**[2]

    A.  **Allegations**

VT, which does business as Moviebeam, offers in-room digital content delivery to the hospitality industry. Mot. at 3. Plaintiff served as VT's Vice President of Sales. Am. Compl. ¶ 12. VT recruited Plaintiff to secure an alliance with Spectrum Enterprise ("Spectrum"), the country's largest cable television enterprise, where Plaintiff previously worked as "National

---

[1] The Court decides the motion without oral argument. Fed. R. Civ. P. 78; L.Civ.R.78(b).
[2] Except where otherwise noted, this section derives from the well-pled factual allegations, affording Plaintiff the benefit of all favorable inferences.

Accounts Executive Manager." *Id.* ¶ 13.  In June 2018, VT's CEO Ankur Sheth approached Plaintiff about investing in VT "in the form of debt and warrants." *Id.* ¶ 16.  The goal was to "bridge [VT] to another equity investment at a much higher valuation for all equity investors." *Id.* ¶ 17.  Plaintiff informed Sheth that "he had never participated in a securities offering," and "was not sophisticated in financial matters." *Id.* ¶ 18.

On or about August 15, 2018, Plaintiff and VT[3] agreed to a $150,000 loan, to be paid in 36 equal monthly installments of $4,166.67, with a final, 37th payment of $25,000 "constituting the financial return on the debt." *Id.* ¶ 19.  Payments would commence at the end of the sixth calendar month after the loan's execution.  *Id.*  VT also "made available warrants for Plaintiff to purchase 46,000 shares of [VT] at .01 par value, or $460."  *Id.*  Plaintiff and VT "agreed to hold off on executing the debt until the alliance with Spectrum was formalized" because Plaintiff's investment money came from borrowing against his mother's investment fund.  *Id.* ¶ 20.

The parties[4] memorialized their understanding in a November 8, 2018 Subscription Agreement (D.E. 28-4, the "Agreement").[5]  The Agreement indicated that Plaintiff "understands that this offering is only being made to 'accredited investors' as that term is defined under Rule 501(a) of Regulation D" and that Plaintiff "meets the definition of 'accredited investor' . . . due to [Plaintiff's] status as an 'executive officer.'"  Agreement ¶ 3(a).

Repayment under the Agreement was due to begin in the sixth month after funding; according to Plaintiff, May 31, 2019.  Agreement ¶ 1(c).  However, beginning in April 2019, VT consistently failed to make payroll.  *Id.* ¶ 34.  On June 10, 2019, Plaintiff signed an "Addendum

---

[3] The Amended Complaint references "Defendant**s**," which apparently includes AKS Group LLC, a "Sheth-related" Delaware LLC.  Am. Compl. ¶ 7.  However, Plaintiff did not include AKS Group in the caption, and there is no indication that he served AKS.  Only VT has appeared.
[4] Plaintiff and VT, not AKS Group.
[5] The Agreement is governed by Delaware law.  D.E. 26 at 19, ¶ 10(b).

2

to the [Agreement]." D.E. 28-8 at 2 (the "Addendum").[6]  The Addendum deferred repayment of Plaintiff's "investment redemption amount of $150,000.00" until VT "commenced billing for Moviebeam services for 10,000 billable rooms." *Id.*  VT has not made any installment payments due under the Agreement. *Id.* ¶¶ 31-32.

Plaintiff quit on November 9, 2019. *Id.* ¶ 35.  In February 2022, "a sophisticated business acquaintance . . . conveyed his concern to Plaintiff that the [d]ebt violated securities law as Plaintiff did not appear to be an accredited investor at the time of the Agreement." *Id.* ¶ 36.  According to Plaintiff, VT knew that Plaintiff was a non-accredited investor because VT knew that: (1) Plaintiff's annual compensation for the year preceding the Agreement was under $200,000; (2) Plaintiff's assets were less than $1 million; and (3) Plaintiff's job lacked policy making authority.

### B. Procedural History

Plaintiff filed this action on June 29, 2022.  D.E. 1.  Plaintiff's first complaint sought rescission of the Financing Transaction. *Id.*  Defendant moved to dismiss the complaint, arguing that Plaintiff was an accredited investor under the plain language of the Regulation D safe harbor exempting transactions made to accredited investors, including an "executive officer," from registration requirements.  D.E. 6.  Defendant also argued, in reply, that the statute of limitations barred Plaintiff's rescission claim.  D.E. 15.

---

[6] A document referred to in the complaint, but not attached, may be considered to prevent plaintiff from avoiding dismissal simply by deciding not to attach the dispositive document. *Lum v. Bank of America*, 361 F.3d 217, 222 n. 3 (3d Cir. 2004).  However, the court may consider such a document only if: (1) its authenticity is undisputed; and (2) the claim is based on the document. *Pension Benefit Guarantee Corp. v. White Consolidated Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). A document forms the basis for a claim if it is "integral to and explicitly relied upon" in the complaint. *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997).  Here, as detailed below, the Addendum's authenticity—albeit not its genesis—is undisputed, and relevant to the allegations.

3

Plaintiff moved to strike Defendant's statute of limitations argument, claiming that it had appeared for the first time in Defendant's reply. D.E. 16. The Court denied the motion to strike, but granted Plaintiff leave to file a surreply. D.E. 17. Plaintiff's surreply did not contest that the Securities Exchange Act claim was barred by the statute of limitations. D.E. 19. Instead, Plaintiff claimed that he was a victim of securities fraud under the Securities Exchange Act because VT had misrepresented to him that he was an accredited investor, permitting VT to forego certain registration and disclosure requirements which might have impacted Plaintiff's decisionmaking. *Id.*

After a conference, Judge Clark terminated the first motion to dismiss and granted Plaintiff leave to amend his complaint. D.E. 23. The Amended Complaint has two counts: (I) Defendant's "Manipulation, Scheming, Fraud" alleging material representations regarding Plaintiff's status as a non-accredited investor; and (II) breach of contract alleging Defendant's failure to begin repayment.

VT now moves to dismiss Plaintiff's Amended Complaint. Mot. Plaintiff opposes. D.E. 29 ("Opp'n"). VT replies.[7] D.E. 39 ("Reply").

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court accepts all well-pled facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (cleaned up). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public

---

[7] The Court denied Plaintiff's request for a surreply. D.E. 33.

4

record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

To survive a Rule 12(b)(6) challenge, the plaintiff's claims must be facially plausible, meaning that the well-pled facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft*, 556 U.S. at 679. Finally, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*

## III. ANALYSIS

### A. The Regulations Generally

Securities and Exchange Commission ("SEC") regulation, 17 C.F.R. § 240.10b-5, more commonly referred to as Rule 10b-5, "makes it unlawful for any person, in connection with the purchase or sale of a security, to (a) employ a device, scheme or artifice to defraud; (b) make any false statement of material fact; or, (c) engage in any act, practice or course of business that operates as fraud or deceit upon any person." *United States v. Wosotowsky*, 527 F. App'x 207, 210 (3d Cir. 2013). Plaintiff's allegation, which falls into the second category, alleges that VT misrepresented Plaintiff's "accredited investor" status, which induced him to invest and caused his losses. Am. Compl. ¶ 45; *see In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 471 (S.D.N.Y. 2017) (finding scheme liability claims under Rule 10b-5(a) and (c) inadequately pled where plaintiffs focused only on defendants' alleged misstatements or omissions, and therefore failed to

5

state that they committed an 'inherently deceptive act that is distinct from an alleged misstatement").

A Rule 10b-5(b) claim requires: (1) a material misrepresentation (or omission); (2) scienter (a wrongful state of mind); (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation. *Fan v. StoneMor Partners LP*, 927 F.3d 710, 714 (3d Cir. 2019). VT challenges each element (many of which overlap), but the parties, and the Court, focus on the requirement that an actionable statement must be both (1) material and (2) false. *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

### B. Plaintiff, As Vice President of Sales, Was an Executive Officer, and Therefore an "Accredited Investor"

VT argues that the Agreement's designation of Plaintiff as an accredited investor status was not a misrepresentation because it is true. The Court agrees.

Security transactions typically require registration. *See* 15 U.S.C. § 77e. But an exception exists for "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(2). Transactions are deemed "not [to involve] any public offering" where, as relevant here, they involve "accredited investors." 17 C.F.R. § 230.506(c)(2)(i).[8]

An accredited investor is "any person who comes within [certain] categories, or who the issuer reasonably believes comes within any of [those] categories, at the time of the sale of the securities to that person." 17 C.F.R. § 230.501(a). Those categories, as relevant here, include:

> (4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

---

[8] Where there are fewer than 35 purchasers, a fact that is undisputed here, an offering is also exempt from registration if the purchasers "have knowledge and experience in financial and business matters to be able to evaluate the merits and risks of the investment." 17 C.F.R. § 230.506(b)(2)(ii).

6

>  (5) Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000; [or]
> (6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

17 C.F.R. § 230.506(a).

Though the Amended Complaint invokes Plaintiff's net worth and income (presumably aimed at subsections (5) and (6)), VT focuses its argument on the "executive officer" category (subsection (4)). Mot. at 8. VT argues that Plaintiff's position as Vice President of Sales qualifies him as an executive officer, and therefore as an accredited investor. And if Plaintiff is an accredited investor, VT argues, the Agreement did not contain a misrepresentation. Mot. at 7-9.

Plaintiff argues that the "Vice President" title does not qualify him as an executive officer (and therefore an accredited investor) because he was not "in charge" of sales and did not otherwise perform any "policy making function." Opp'n at 2. Plaintiff cites cases embracing this "functional approach" theory. *Id.* at 3-4.

The Court finds VT's position more persuasive. The analysis can begin and end with the regulatory text: an executive officer is "the president, any vice president in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function, or any other person who performs similar policy making functions for the issuer." 17 C.F.R. § 230.501(f). The regulation's use of "any *other* officer" plainly presumes that a president or "any vice president in charge of a principal business unit . . . (such as sales . . .)" has a "policy making function." *Id.* Conversely, the policy making functions of "any other officer . . . or any other person" must be determined on a case-by-case basis. *C.R.A. Realty Corp. v. Crotty*, 878 F.2d 562, 568 (2d Cir. 1989) (Meskill, J., dissenting) ("While these

7

provisions clearly leave room to construe as officers those who do not possess the titles of officers, they do not permit the reverse inference. . . . [A]ny extraneous considerations, such as the statute's legislative history, are irrelevant to an analysis of the statute's meaning.").

Even if the Court were to examine the purpose and history of the regulation, however, the same conclusion would result. The exemption in 15 USCS § 77d(1) "was intended to permit private sales of unregistered securities to investors who are likely to have such information as is ordinarily disclosed in registration statements." *SEC v. Guild Films Co.*, 279 F.2d 485, 490 (2d Cir. 1960), *cert. denied*, 364 U.S. 819 (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953)). And final rules accompanying the regulations clarify that "[t]he more information an issuer has indicating that a prospective purchaser is an accredited investor, the fewer steps it may have to take, and vice versa. . . . If an issuer has actual knowledge that the purchaser is an accredited investor, then the issuer will not have to take any steps at all." 78 FR 44771, 44779; 2013 SEC LEXIS 2004, at *32 n.11. More recent regulatory amendments have narrowed the coverage from "officers" to "executive officers," a change geared toward exempting "officers without policy-making responsibility." *Aleynikov v. Goldman Sachs Grp., Inc.*, No. 10636, 2016 Del. Ch. LEXIS 222, at *12-13 (Del. Ch. July 13, 2016). Thus, the decision to explicitly name presidents and vice presidents in charge of certain departments (like Plaintiff) gains significance; the regulation assumes policy making authority for individuals in those roles.

Nor do the cases cited by Plaintiff alter this conclusion. The circuits that have spoken on this issue[9] examined insider trading/short-swing regulations, not the regulation at issue here. But insider trading regulations address a different consideration: attempts to avoid obligations by "hid[ing] a significant figure in the management of a company" behind a vague title, such as

---

[9] The Third Circuit has not.

"consultant." *SEC v. Prince*, 942 F. Supp. 2d 108, 134 (D.D.C. 2013) (quoting *SEC v. Enters. Sols., Inc.*, 142 F. Supp. 2d 561, 574 (S.D.N.Y. 2001) (finding that employee's activities were "sufficiently similar to the duties of an officer or director of the company that his involvement, along with his history of criminal and regulatory violations, ought to have been disclosed."); *Colby v. Klune*, 178 F.2d 872 (2d Cir. 1949) (reversing and remanding for a factual inquiry into the question whether, despite the employee's "production manager" title, the defendant was nevertheless an officer within the meaning of the statute).

In the insider trading context, it makes sense to "look behind the title of the purchaser or seller to ascertain that person's real duties" because, whatever their title, they may "have a relationship to the company which gives him the very access to insider information that the statute was designed to reach." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Livingston*, 566 F.2d 1119, 1122 (9th Cir. 1978). The regulation's aim is to take "the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great and to prevent the use by insiders of confidential information, accessible because of one's corporate position or status, in speculative trading in the securities of one's corporation for personal profit." *Id.* at 1121-22 (9th Cir. 1978).

The same consideration does not exist here; the accredited investor regulation exists to protect the public, not a company's officers. Plaintiff does not explain how his interpretation is "consistent with the SEC's overriding obligation to protect the investing public." *SEC v. Prince*, 942 F. Supp. 2d at 134 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976) (noting that investor protection was a primary purpose behind passage of the Securities Act of 1933 and Securities Exchange Act of 1934)); *see also* 86 FR 3496, 3509 ("As the Commission stated in 2007, we believe that improper reliance on exemptions from registration harms investors by

9

depriving them of the benefits of full and fair disclosure and the civil remedies that flow from registration.").

The Court finds *Winston v. Fed. Express Corp.*, 853 F.2d 455 (6th Cir. 1988), more persuasive. There, Winston appealed a finding that his positions with his employer as Vice President of Network Systems, and later Senior Vice President of Electronic Products, rendered him an "officer" subject to Section 16(b). *Id.* Winston had resigned on August 27, 1985, but remained on the payroll until September 30, the day he exercised options of the employer's stock. *Id.* at 456. When Winston later sold those shares, he learned that he had technically engaged in a short-swing transaction under section 16(b), and his employer was entitled to recoup the profits. *Id.*

Winston sued, arguing that he was not an "officer" for section 16(b) purposes when he bought the stock because he "did not actively participate in the duties of his office after" his resignation. *Id.* After the district court granted summary judgment to his employer, Winston appealed. *Id.* at 455. The Sixth Circuit affirmed. *Id.* The court held that "Congress intended section 16(b) to be a 'relatively arbitrary rule capable of easy administration,'" generally interpreted "so as to preserve its mechanical quality." *Id.* at 456 (quoting *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 425 (1972)). "In deciding whether an individual is an officer for purposes of section 16(b), therefore, courts tend to look solely at the title the individual holds." *Id.* "'It does not matter whether the insider actually received the information, or utilized it; his mere status makes him liable." *Id.* (quoting *Nat'l Med. Enters., Inc. v. Small*, 680 F.2d 83, 84 (9th Cir. 1982)).

*Winston*, like Plaintiff, notes that courts have found exceptions "where the title is essentially honorary, ceremonial, purely titular, or not real." *Id.* at 456-57 (cleaned up), *reh'g*

10

*denied*, 491 F.2d 729, *cert. denied*, 419 U.S. 873 (1974)). But "this exception does not open the door to a detailed factual inquiry in each case"; for example, where—as Plaintiff's title does here—the title alone confers executive officer status. *Nat'l Med. Enters.*, 680 F.2d 83, 84 (9th Cir. 1982) (finding individuals to be officers based on their titles: Senior Executive Vice-Presidents in charge of different departments); *cf. Livingston*, 566 F.2d 1119, 1122 (9th Cir. 1978) (analyzing specific job duties where title was simply "Vice President"); *Gold v. Sloan*, 486 F.2d 340, 359 (4th Cir. 1973) (same).

### C. The "Accredited Investor" Representation Was Not Material, and Did Not Cause Plaintiff's Loss

To be actionable, a misrepresentation must also be material. *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Tsc Indus. v. Northway*, 426 U.S. 438, 449 (1976). "There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*

VT argues that the "accredited investor" designation, even if false, could not have been material to his investment decision because *Plaintiff* represented himself as an accredited investor. The Court agrees. The Agreement's "Representation and Warranties" section provides that Plaintiff and VT "agree[] and acknowledge[] that [Plaintiff] meets the definition of 'accredited investor' under Rule 50l(a) of Regulation D with respect to [Plaintiff's] subscription for the Investment, due to [his] status as an 'executive officer' (as defined in Rule 50l(a) of Regulation D)." D.E. 26 at 15, ¶3(a). Plaintiff cannot now disavow that representation to pursue his claim. *See Supernova Sys. v. Great Am. Broadband, Inc.*, No. 1:10-CV-319, 2012 U.S. Dist. LEXIS 16182, at *16-17 (N.D. Ind. Feb. 9, 2012) (collecting cases in which investors were estopped from

11

disavowing their representations that they were "accredited investors" after previously certifying the opposite).

Plaintiff argues, in substance, that the Court should disregard the Agreement's plain language because VT drafted it, and was therefore better positioned to determine Plaintiff's "accredited investor" status. Opp'n at 6-7. However, sophisticated parties are bound by agreements they negotiated at arm's length. *Strategy v. Festival Retail Fund Bh, L.P.*, No. 2017-0017, 2023 Del. Ch. LEXIS 204, at *16 (July 17, 2023). "It is not the court's role to rewrite a contract between sophisticated market participants . . . to suit the court's sense of equity or fairness." *Id.*

Plaintiff also argues, based on "common sense and the Securities Exchange Act of 1934," that VT's misrepresentation of Plaintiff's accredited investor status deprived him of "extensive documentation and financial statements akin to a private placement memorandum," which would have made Plaintiff "more aware of the [investment] risk . . . ." Opp'n at 5. Plaintiff would also have been limited to a lower investment. *Id.* Phrased differently, VT only got Plaintiff to invest as much as he did—and Plaintiff only lost what he did—because he was incorrectly designated as an accredited investor. *Id.*

Plaintiff's argument is more closely related to Rule 10b-5's loss causation element, which requires "an actual loss as a result of the alleged misrepresentation." *Rocker Mgmt., LLC v. Lernout & Hauspie Speech Prods. N.V.*, No. 00cv5965, 2007 U.S. Dist. LEXIS 70912, at *44 (D.N.J. Sep. 24, 2007); *Newton v. Merrill Lynch*, 259 F.3d 154, 177-78 (3d Cir. 2001) ("Failure to show actual damages is a fatal defect in a Rule 10b-5 cause of action."). The loss causation inquiry "typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement." *Berckeley Inv.*

*Group Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006).  The loss causation element requires the plaintiff to prove "that it was the very facts about which the defendant lied which caused its injuries."  *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997) (*citing LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir. 1988)).

In the typical "fraud-on-the-market" § 10(b) action, where a publicly traded security's price was allegedly inflated by a fraudulent misrepresentation or omission, the loss causation requirement requires that the revelation of that misrepresentation or omission was a substantial factor in lowering the security's price, thus creating an actual economic loss for the plaintiff. *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir. 2007); *see Colkitt*, 455 F.3d at 208 (quoting *Newton*, 259 F.3d at 173) ("The customary Section 10(b) claim concerns 'fraudulent material misrepresentation[s] or omission[s] that affect[] a security's value.'").  "In the 'non-typical' case, where the plaintiff is not just alleging a lowered price, the factual predicates of loss causation fall into less of a rigid pattern."  *Id.* at 426.  But in either case, a plaintiff "must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiffs economic loss."  *Id.*

Here, Plaintiff alleges that had he not been designated as an accredited investor, he might have received more information about his investment, and invested less of his money.  Neither alleges loss based on the stock's value.  *See Lindberg v. Clarion Sintered Metals, Inc.*, 711 F. Supp. 2d 458, 470 (W.D. Pa. 2010) (finding that the failure to disclose related party transactions did not "itself account for the suppressed" share price); *Gallup v. Clarion Sintered Metals, Inc.*, No. 1:08-cv-195, 2011 U.S. Dist. LEXIS 112492, at *16-17 (W.D. Pa. Sept. 30, 2011) (finding that fully

13

compliant accounting statements, even if disclosed, would not have revealed that defendant's related entity was, as alleged, a "sham corporation lacking any real business purpose or value").[10]

Accordingly, Plaintiff's securities fraud claim will be dismissed. Though amendment would likely be futile as to this claim, the Court, out of an abundance of caution, will permit Plaintiff a further opportunity to file a Second Amended Complaint. The Court cautions, however, that Plaintiff may not simply restate or repackage the claim and arguments already addressed here.

### D. The Amended Complaint Does Not Adequately Allege a Breach of Contract

Under Delaware law, a breach of contract claim comprises three elements: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

The Amended Complaint alleges that Defendants failed to pay the Agreement's first repayment installment, due May 31, 2019. Am. Compl. ¶ 31. VT argues that this does not adequately allege a breach of contract because the Addendum, which Plaintiff does not dispute signing, defers repayment under the Agreement "until [VT] has commenced billing for Moviebeam services for 10,000 billable rooms." *Id.* And because the Amended Complaint does not allege that VT has billed for 10,000 billable rooms, a breach is not adequately alleged.

The Court agrees. As discussed below, the exact understanding and implications of the Agreement and Addendum are clearly disputed. But Plaintiff does not dispute the Addendum's existence, authenticity, or terms. This is sufficient to find, at this juncture, that Plaintiff has not adequately pled a breach of contract. The Addendum's 10,000-room threshold appears to govern, and the Amended Complaint does not pled that VT/Moviebeam exceeded that threshold. Accordingly, dismissal without prejudice, with an opportunity to amend, is appropriate.

---

[10] Based on these holdings, the Court need not address the other Rule 10b-5 elements.

Plaintiff's counterarguments are plausible, but likewise inadequately pled and supported at this time. The first is that the Addendum does not apply because VT coerced him into signing by withholding his wages. Opp'n at 9. VT argues that Plaintiff's coercion/economic duress argument fails because "he fails to allege any reason why he could not have simply refused to sign and then sued for unpaid wages." Reply at 14 n.6.

However, under Delaware law, a contract is voidable for duress only where the Plaintiff can prove (1) a "wrongful" act, (2) which overcomes the will of the aggrieved party, (3) who has no adequate legal remedy to protect himself. *Cianci v. JEM Enter.*, No. 16419, 2000 Del. Ch. LEXIS 125, at *30 (Aug. 22, 2000). And as VT argues, a party seeking to void a contract for duress must prove that the defendant took "advantage of an exigent circumstance such that the victim could not reasonably be expected to resist and seek legal relief to protect his interests." *Id.* at *41. While Plaintiff now claims that he had to choose between forfeiting wages or signing the Addendum, he does not allege that he lacked an adequate legal remedy, or any other facts demonstrating an exigency. *See, e.g.*, *Conger v. Legg Mason, Inc.*, No. N11C-02-115, 2011 Del. Super. LEXIS 496, at *6 (Super. Ct. July 21, 2011) (denying motion to dismiss based on economic duress: "Out of fear of retaliation or termination, Plaintiff did not continue to object to the below contract distributions."); *cf. Cianci*, 16419, 2000 Del. Ch. LEXIS 125, at *41 (noting that plaintiff's failure to seek help after meeting was consistent with conclusion that bullying threats did not cause defendant to agree to proposal).

Plaintiff's second argument is more plausible, but likewise unpled and unsupported. Plaintiff argues that VT *has* exceeded the 10,000-room threshold that triggers repayment under the Addendum.[11] *Id.* at 12 ("Plaintiff has firsthand knowledge of [VT] illegally underreporting room

---

[11] This also bolsters the Addendum's authenticity.

numbers to preclude payments to a specific vendor. . . . [Spectrum] has been marketing approximately 50,000 rooms . . . ."). However, that allegation is only in Plaintiff's opposition, not the Amended Complaint. *Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) ("[T]he complaint may not be amended by the briefs in opposition to a motion to dismiss."). Out of an abundance of caution, however, the Court will permit Plaintiff an opportunity to amend his complaint with respect to the breach of contract claim.

IV. CONCLUSION

For the reasons above, the Court will **GRANT** VT's motion to dismiss and **DISMISS** Plaintiff's Amended Complaint. Plaintiff may file an Amended Complaint within 30 days. An appropriate order accompanies this Opinion.

December 20, 2023

                                                                           Evelyn Padin, U.S.D.J.